**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES CANNON JR., on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMCAST CORPORATION, THE COMCAST CORPORATION BENEFITS FIDUCIARY COMMITTEE, and JOHN DOES 1-20,<br><br>Defendants. | Civil Action No. 2:26-cv-04998-GAM |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 3

A. Legal Background ........ 3

B. The Plan ........ 7

C. Plaintiff ........ 8

D. Plaintiff's Claims ........ 9

ARGUMENT ........ 9

I. Plaintiff's challenge to the Plan's alternative standard (Count I) fails as a matter of law. ........ 10

A. Count I fails to state a claim because Plaintiff alleges that the Plan offers participants an annual opportunity to avoid the surcharge by enrolling in a tobacco cessation program. ........ 11

B. Count I fails to state a claim because the statute requires plans to provide a reasonable alternative standard only to participants with specific medical needs that Plaintiff does not allege here. ........ 15

II. Plaintiff's challenge to the Plan's disclosures (Count II) fails because Plaintiff does not allege that any Plan document lacked any required content. ........ 18

III. Plaintiff's derivative fiduciary-related claims (Counts III-IV) fail as a matter of law. ........ 22

A. Count III fails as a matter of law because Plaintiff does not allege any loss to the Plan, as required. ........ 22

B. Plaintiff's fiduciary breach allegations in Counts III and IV fail as a matter of law because Plaintiff does not challenge any fiduciary conduct. ........ 23

C. Plaintiff's prohibited transaction allegations in Counts III and IV fail as a matter of law. ........ 25

CONCLUSION ........ 27

# TABLE OF AUTHORITIES


**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 9

*Bailey v. Sedgwick Claims Mgmt. Servs., Inc.*,
2025 WL 2779899 (W.D. Tenn. Sept. 26, 2025) .......... 12

*Barragan v. Honeywell Int'l Inc.*,
2025 WL 2383652 (D.N.J. Aug. 18, 2025) .......... 26

*Brown v. Peco Foods, Inc.*,
812 F. Supp. 3d 664 (S.D. Miss. 2025) .......... 26

*Chirinian v. Travelers Cos.*,
2025 WL 2147271 (D. Minn. July 29, 2025) .......... 12, 14

*Connelly v. Lane Constr. Corp.*,
809 F.3d 780 (3d Cir. 2016) .......... 10

*Duncan v. Walker*,
533 U.S. 167 (2001) .......... 16

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) .......... 9

*Greene v. Progressive Corp.*,
2026 WL 785004 (N.D. Ohio Mar. 20, 2026) .......... passim

*Groves v. Modified Ret. Plan*,
803 F.2d 109 (3d Cir. 1986) .......... 24

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) .......... 26

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999) .......... 24

*Kollman v. Hewitt Assocs., LLC*,
487 F.3d 139 (3d Cir. 2007) .......... 16

*Kucana v. Holder*,
558 U.S. 233 (2010) .......... 16

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
552 U.S. 248 (2008) .......... 22

**TABLE OF AUTHORITIES**

**Page(s)**

*Leckey v. Stefano*,
501 F.3d 212 (3d Cir. 2007)....................22, 23

*Leslie v. Rentokil N. Am., Inc.*,
2026 WL 950490 (E.D. Pa. Apr. 8, 2026)....................14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................16, 17

*Lutz v. Portfolio Recovery Assocs.*,
49 F.4th 323 (3d Cir. 2022)....................10

*McCaffree Fin. Corp. v. ADP, Inc.*,
2022 WL 970282 (D.N.J. Mar. 31, 2022)....................25

*Nat'l Sec. Sys., Inc. v. Iola*,
700 F.3d 65 (3d Cir. 2012)....................26

*Noel v. Pepsico, Inc.*,
832 F. Supp. 3d 303 (S.D.N.Y. 2026).................... passim

*Parisi v. Am. Airlines, Inc.*,
2025 WL 4663147 (N.D. Tex. Nov. 25, 2025)....................25

*Parker v. TTEC Holdings, Inc.*,
826 F. Supp. 3d 1293 (D. Colo. 2026)....................10, 13, 23, 25

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)....................9

*Pegram v. Herdrich*,
530 U.S. 211 (2000)....................23

*Plesha v. Ascension Health All.*,
2026 WL 279321 (E.D. Mo. Feb. 3, 2026)....................10, 22, 25

*Schultz v. Glens Falls Hosp.*,
2026 WL 850332 (N.D.N.Y. Mar. 26, 2026)....................23, 26

*Sec'y of Lab. v. Macy's, Inc.*,
2021 WL 5359769 (S.D. Ohio Nov. 17, 2021)....................24

*Spencer v. Campbell Soup Co.*,
2026 WL 2111153 (D.N.J. July 22, 2026).................... passim

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................21

**TABLE OF AUTHORITIES**

**Page(s)**

*Trout v. Meijer, Inc.*,
2026 WL 1098213 (W.D. Mich. Apr. 23, 2026) ....................12, 14

*Trout v. Meijer, Inc.*,
2026 WL 2581855 (W.D. Mich. Sept. 1, 2026) ....................21, 26

*Wachtel v. Health Net, Inc.*,
482 F.3d 225 (3d Cir. 2007)....................23

*Williams v. Bally's Mgmt. Grp., LLC*,
813 F. Supp. 3d 263 (D.R.I. 2025)....................10, 14

*Williams v. Target Corp.*,
2026 WL 2111339 (D. Minn. July 22, 2026) ....................10, 17, 21, 22

*Williams v. Taylor*,
529 U.S. 362 (2000)....................16

**STATUTES**

29 U.S.C. § 1021....................20

29 U.S.C. § 1023....................20

29 U.S.C. § 1025....................18

29 U.S.C. § 1106....................25, 26

29 U.S.C. § 1109....................24

29 U.S.C. § 1132....................16, 20, 22

29 U.S.C. § 1182....................1, 3, 26

29 U.S.C. § 1185d....................5, 15

42 U.S.C. § 300gg-4 .................... passim

DOL, *FAQs About Affordable Care Act and Health Insurance Portability and Accountability Act Implementation Part 74* (Aug. 26, 2026), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-74 (last visited Oct. 19, 2026)....................6, 14

DOL, *FAQs About Affordable Care Act Implementation (Part XVIII) and Mental Health Parity Implementation* (Jan. 9, 2014), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-18, (last visited Oct. 19, 2026)....................2, 6, 12, 14

Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936....................3

## TABLE OF AUTHORITIES

**Page(s)**

**OTHER AUTHORITIES**

29 C.F.R. § 2509.75-8 .....25

29 C.F.R. § 2590.702 ..... passim

Fed. R. Civ. P. 12 .....14

Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33158, 2013 WL 2368971 (June 3, 2013) ..... passim

Nondiscrimination and Wellness Programs in Health Coverage in the Group Market, 71 Fed. Reg. 75014, 2006 WL 3610248 (Dec. 13, 2006) .....3, 4, 17

S. Rep. No. 104-156 (1995) .....3

## INTRODUCTION

The Employee Retirement Income Security Act of 1974 ("ERISA") allows health plans to offer participants premium discounts or rebates in exchange for "adherence to programs of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2)(B). A "tobacco surcharge" program that "rewards" non-tobacco users with a lower premium is an example. When a health plan offers such a program, Congress requires the plan to offer an "alternative standard" to earn the reward for certain participants for whom, due to a medical condition, it would be "medically inadvisable" or "unreasonably difficult" to not use tobacco. 42 U.S.C. § 300gg-4(j)(3)(D).

The Comcast Comprehensive Health and Welfare Benefit Plan (the "Plan") is more generous than the statute requires. The Plan imposes a surcharge for tobacco use, but the Plan affords all participants—not just those with a covered medical condition—the opportunity to avoid the surcharge. As Plaintiff admits in the Complaint, tobacco users who enroll in an alternative educational program on tobacco cessation before an April 1 "enrollment deadline" avoid the entire surcharge.[1] *See infra* at 7. And Plaintiff also admits that the Plan tells participants about "the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E); *see* Compl. ¶ 37, ECF No. 1.

Nevertheless, Plaintiff claims that Comcast's Plan is unlawful because (1) Comcast imposes the April 1 deadline for enrolling and does not allow participants who enroll in a tobacco cessation program *after* April 1 to receive a refund of surcharges they already paid; and (2) Comcast did not tell participants in a 2013 communication that they also could enroll in a tobacco cessation program recommended by their personal physician and avoid the surcharge. Compl.

---

[1] Plaintiff's allegations are factually wrong. The Plan fully reimburses all participants who complete a tobacco cessation program at any time during the year (not just those who enroll by April 1) for any tobacco surcharges that they previously paid. Nevertheless, Comcast *assumes* for purposes of this Motion the truth of Plaintiff's well-pled factual allegations.

¶¶ 41, 74, 75.

As a matter of law and statutory construction, Plaintiff's allegations fail to state a claim because the statute does not require what Plaintiff claims.

First, the statute only requires plans to offer participants the opportunity to avoid the tobacco surcharge "at least once each year." 42 U.S.C. § 300gg-4(j)(3)(C). As Plaintiff admits, the Plan does this by allowing participants who enroll in a tobacco cessation program by April 1 to avoid the surcharge. Plaintiff's argument that plans are required to offer participants the opportunity to avoid the surcharge by enrolling in a tobacco cessation program any time they want, 365 days a year, reads out the "at least once each year" provision of the statute. And the Department of Labor ("DOL") makes clear that plans can impose enrollment deadlines for tobacco cessation programs just like Plaintiff alleges the Plan does here. DOL, *FAQs About Affordable Care Act Implementation (Part XVIII) and Mental Health Parity Implementation* (Jan. 9, 2014) ("*2014 FAQs*").[2]

Second, the statute only requires plans to offer a reasonable alternative standard to those individuals with a medical condition that would make it "unreasonably difficult" or "medically inadvisable" to cease using tobacco. 42 U.S.C. § 300gg-4(j)(3)(D). Plaintiff does not allege that he has such a condition, so the Plan was not required to offer *him* any alternative standard at all. *Spencer v. Campbell Soup Co.*, 2026 WL 2111153, at *9 n.7 (D.N.J. July 22, 2026).

Third, Plaintiff's challenges to the Plan's disclosures fail too. The only disclosure requirement in the statute is about "the availability of reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E). Plaintiff admits the Plan does this. Compl. ¶¶ 37, 41. Although Plaintiff argues plans also must disclose details about "rewards" and include "physician-accommodation

---

[2] https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-18, (last visited Oct. 19, 2026).

statements," that is not what the statutory language says or requires.

Finally, Plaintiff recycles his claims of violations of wellness program requirements into additional claims for violations of more general ERISA provisions, but these claims fail on both the same and additional independent grounds.

For these reasons, and those explained more fully below, the Court should dismiss the Complaint.

## BACKGROUND

### A. Legal Background

In 1996, Congress amended ERISA to prohibit discrimination based on health status while preserving health plans' ability to offer programs to encourage healthy choices. *See* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 101, 110 Stat. 1936, 1946. The relevant prohibition on discrimination instructs that a "group health plan … may not require any individual … to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual … on the basis of any health status-related factor." 29 U.S.C. § 1182(b)(1). The statute expressly protects wellness programs by elaborating that "[n]othing in" the prohibition on discrimination "shall be construed … to prevent a group health plan … from establishing premium discounts or rebates … in return for adherence to programs of health promotion and disease prevention." *Id.* § 1182(b)(2). This provision ensures that the prohibition on discrimination is not interpreted as forbidding health plans from offering financial rewards "in return for adherence to programs of health promotion and disease prevention." S. Rep. No. 104-156, at 19-20 (1995). "For example, an employer could offer a reduced premium to non-smokers." *Id.* at 20.

DOL promulgated regulations interpreting the 1996 amendments in 2006. *See* Nondiscrimination and Wellness Programs in Health Coverage in the Group Market, 71 Fed. Reg.

75014, 2006 WL 3610248 (Dec. 13, 2006) (the "2006 Regulation"). The 2006 Regulation created new requirements for wellness programs that provide rewards "based on an individual satisfying a standard that is related to a health factor," including a mandate to give eligible individuals "the opportunity to qualify for the reward under the program at least once per year." *Id.* at 75036. The 2006 Regulation also required such programs to offer an "alternative standard for obtaining the reward for certain individuals": namely, individuals for whom it was either "unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard" or "medically inadvisable to attempt to satisfy the otherwise applicable standard." *Id.* at 75019, 75036. The regulation allowed (but did not require) plans to "seek verification, such as a statement from a physician, that a health factor" placed a participant into one of these categories. *Id.* at 75019.

The 2006 Regulation specified that plans did "not need to establish" any "specific reasonable alternative standard before the program commence[d]." *Id.* Instead, it was "sufficient to determine a reasonable alternative standard once a participant inform[ed] the plan" that either of the above qualifying medical circumstances applied to him. *Id.* For example, if a plan "assessed a surcharge" on participants who used tobacco within the past year, and a participant informed the plan that it was "unreasonably difficult for [him] to stop smoking cigarettes," the plan could offer him the option "to participate in a smoking cessation program to avoid the surcharge." *Id.* at 75037. That option would qualify as a reasonable alternative standard, and the plan would comply with the 2006 Regulation—including if the plan requested "a statement from a physician" or other "verification" of the participant's medical needs before providing the alternative. *Id.* at 75019.

In 2010, Congress codified the 2006 Regulation nearly word for word through the Affordable Care Act. This legislation amended the governing statutory requirements to make clear that a permissible wellness program "reward may be in the form of … the absence of a surcharge."

42 U.S.C. § 300gg-4(j)(3)(A); *see also* 29 U.S.C. § 1185d(a)(1). The statute also incorporated the 2006 Regulation's substantive requirements for wellness programs. These requirements include:

- "The plan shall give individuals eligible for the program the opportunity to qualify for the reward under the program at least once each year." 42 U.S.C. § 300gg-4(j)(3)(C).

- "The full reward under the wellness program shall be made available to all similarly situated individuals." *Id.* § 300gg-4(j)(3)(D).

- "The plan … shall disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under subparagraph (D)." *Id.* § 300gg-4(j)(3)(E).

A wellness program makes the full reward "available" by letting all similarly situated employees avoid the surcharge by complying with the primary standard (e.g., not using tobacco) and by providing "a reasonable alternative standard" to "any individual for whom" it is either "unreasonably difficult due to a medical condition to satisfy" or "medically inadvisable to attempt to satisfy" the "otherwise applicable standard." *Id.* § 300gg-4(j)(3)(D)(i)(I), (II).

The statute also continues to allow plans the option to "seek verification, such as a statement from an individual's physician, that a health status factor makes it unreasonably difficult or medically inadvisable for the individual to satisfy or attempt to satisfy the otherwise applicable standard." *Id.* § 300gg-4(j)(3)(D)(ii). In other words, the statute allows plans to seek verification that an individual qualifies for the alternative standard. This is the only place in the statute where a participant's physician is referenced.

DOL promulgated new regulations in 2013. *See* Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33158, 2013 WL 2368971 (June 3, 2013) (the "2013 Regulation"). The 2013 Regulation tracks the statute in requiring plans to offer "the opportunity to qualify for the reward under the program" (here, no surcharge) "once per year." 29 C.F.R. § 2590.702(f)(4)(i). If a plan makes the reward available once per year, it also can offer

participants the opportunity to enroll in a tobacco cessation program other times during the year with no reward, or just a partial reward. The DOL explained this requirement as part of a series of Frequently Asked Questions:

> Q8: A group health plan charges participants a tobacco premium surcharge but also provides an opportunity to avoid the surcharge if, at the time of enrollment or annual reenrollment, the participant agrees to participate in (and subsequently completes within the plan year) a tobacco cessation educational program. A participant who is a tobacco user initially declines the opportunity to participate in the tobacco cessation program, but joins in the middle of the plan year. Is the plan required to provide the opportunity to avoid the surcharge or provide another reward to the individual for that plan year?
>
> No. If a participant is provided a reasonable opportunity to enroll in the tobacco cessation program at the beginning of the plan year and qualify for the reward (i.e., avoiding the tobacco premium surcharge) under the program, the plan is not required (but is permitted) to provide another opportunity to avoid the tobacco premium surcharge until renewal or reenrollment for coverage for the next plan year. Nothing, however, prevents a plan or issuer from allowing rewards (including pro-rated rewards) for mid-year enrollment in a wellness program for that plan year.

DOL, *2014 FAQs*, *supra*, at Q8.

The 2013 Regulation also departs from the statute in at least two ways. First, the 2013 Regulation requires plans to provide "a reasonable alternative standard" to *all* participants, not just those for whom it would be "unreasonably difficult" or "medically inadvisable" to cease using tobacco. 29 C.F.R. § 2590.702(f)(4)(iv). Second, the 2013 Regulation imposes an obligation to tell participants "that recommendations of an individual's personal physician will be accommodated." 29 C.F.R. § 2590.702(f)(4)(v). Neither of these requirements are in the statute.[3]

---

[3] The preamble to the 2013 Regulation states that plans are not required "to establish a particular reasonable alternative standard in advance of an individual's specific request for one, as long as" they do so "upon an individual's request." 2013 Regulation, 78 Fed. Reg. at 33163. Under these circumstances, the preamble takes the view that "retroactive payment of the reward" may be required when a plan provides an alternative only upon request, to account for the fact that "an individual may take some time to request, establish, and satisfy a reasonable alternative standard." *Id.* Subsequent DOL guidance has retracted that view and emphasized that "[t]hese statements in the preamble were not incorporated into the regulatory text of the 2013 final rules." DOL, *FAQs About Affordable Care Act and Health Insurance Portability and Accountability Act*

### B. The Plan

According to the Complaint, the Plan applies "a $50 per month surcharge" for tobacco use. Compl. ¶¶ 37, 50. The Plan determines whether to apply this surcharge by asking participants to "declare their tobacco status" annually. *Id.* ¶ 37. "Employees who declare as a tobacco user can avoid the tobacco-user rate by enrolling in and completing Comcast's Tobacco Cessation Program." *Id.* The Plan also gives employees the alternative "option to enroll in a tobacco cessation program through their Primary Care Physician (PCP)," and explains that "[t]his option is always available to employees." *Id.*

Plaintiff alleges that participants who declare tobacco use may avoid paying any tobacco surcharge for an entire Plan year by *enrolling in* a cessation program during the first three months of the year. *See id.*; *id.* ¶ 41 (alleging that Plan previously communicated that in order to "keep the tobacco-free rate" for a plan year, tobacco users could "set their status as a 'tobacco user ready to quit' and enroll in our Tobacco Cessation Program by April 1, 2013").

Plaintiff objects that the Plan allegedly "fails to provide those individuals" who enroll in a cessation program after the applicable April 1 deadline "with retroactive reimbursement" for any tobacco surcharges that they previously paid. *Id.* ¶ 6; *see also id.* ¶ 42 (alleging that "no retroactive relief mechanism" is available to "participants who miss the enrollment deadline"). Plaintiff argues that "[a] plan cannot make the full reward turn on a brief, front-end enrollment window, even if that window occurs before or at the beginning of the plan year," and he alleges that "[i]n this case, the window was a three-month period." *Id.* ¶ 42. Plaintiff does not allege that the Plan imposes any deadline for a participant to *complete* a tobacco cessation program as long as they

---

*Implementation Part 74* (Aug. 26, 2026) ("*2026 FAQs*"), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-74 (last visited Oct. 19, 2026).

enroll in it during the first three months of the year. *Id.*

The Complaint identifies two Plan disclosures. First, Plaintiff alleges that the Plan's "SPD describes the tobacco surcharge" and "cessation option[s]" that allow employees who use tobacco products to "avoid the tobacco-user rate by enrolling in and completing Comcast's Tobacco Cessation Program." *Id.* ¶ 37. The Complaint also quotes the SPD as explaining that "[e]mployees also have the option to enroll in a tobacco cessation program through their Primary Care Physician (PCP)." *Id.* Second, Plaintiff alleges that before April 1, 2013, the Plan disseminated a "'Get the Facts' fact sheet" that "describe[d] the surcharge through five enumerated 'facts,'" including "that '[t]obacco users who set their status as a 'tobacco user ready to quit' and enroll in our Tobacco Cessation Program by April 1, 2013 will keep the tobacco-free rate." *Id.* ¶ 41.

### C. Plaintiff

Plaintiff alleges that he is a Comcast employee and participant in the Plan. Compl. ¶ 15. Plaintiff alleges that he paid a "tobacco surcharge of $25 per paycheck during the 2025 Plan year." *Id.* ¶ 47. The Complaint pleads no other facts about Plaintiff. For example, the Complaint does not allege that Plaintiff has a medical condition that makes it "unreasonably difficult" or "medically inadvisable" for him to cease using tobacco, or even that Plaintiff in fact used tobacco. The Complaint does not allege that Plaintiff tried to complete a tobacco cessation program; that he would have completed one had he been told certain information about it; that he even read the SPD or 2013 fact sheet; that he enrolled in a tobacco cessation program before, or after, April 1; or that his physician recommended an alternative program to him. In other words, Plaintiff does not allege he would have avoided the tobacco surcharge if the Plan had complied with everything he claims is required by the statute, or if the Plan's disclosures contained all of the information he claims was missing.

**D. Plaintiff's Claims**

Plaintiff filed his four-count Class Action Complaint on July 17, 2026. Count I asserts an "unlawful surcharge" based on a purported "failure to make available a reasonable alternative standard." *Id.* at 28. Count II asserts a claim based on a purported "failure to provide required notice." *Id.* at 31. Counts III and IV essentially re-allege the first two claims under different labels and statutory provisions. *Id.* at 33 (Count III, asserting claim for "breach of fiduciary duty and prohibited transactions (plan-level relief)"); *id.* at 38 (Count IV, asserting claim for "breach of fiduciary duty (individual relief)").

**ARGUMENT**

The "motion to dismiss for failure to state a claim" is an "important mechanism for weeding out meritless claims" in ERISA class actions. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). That is so in part because "the prospect of discovery in" such cases "is ominous," which "elevates the possibility that 'a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *PBGC ex rel. St. Vincent Cath. Med. Ctrs. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (brackets omitted) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The "analysis involves disregarding allegations in the complaint that are legal conclusions,

speculative, or threadbare." *Lutz v. Portfolio Recovery Assocs.*, 49 F.4th 323, 330 (3d Cir. 2022). For example, when "allegations paraphrase in one way or another the pertinent statutory language or elements of the claims in question," a court must reject those allegations as "disentitled to any presumption of truth" and instead focus on any remaining "allegations of historical fact." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016).

Numerous courts have wrestled with claims challenging tobacco surcharge programs in health plans. *See, e.g.*, *Spencer v. Campbell Soup Co.*, 2026 WL 2111153 (D.N.J. July 22, 2026) (granting motion to dismiss); *Williams v. Target Corp.*, 2026 WL 2111339 (D. Minn. July 22, 2026) (same), *appeal filed*, No. 26-2713 (8th Cir. Aug. 26, 2026); *Parker v. TTEC Holdings, Inc.*, 826 F. Supp. 3d 1293 (D. Colo. 2026) (same); *Greene v. Progressive Corp.*, 2026 WL 785004 (N.D. Ohio Mar. 20, 2026) (same), *appeal filed*, No. 26-3351 (6th Cir. Apr. 22, 2026); *Noel v. Pepsico, Inc.*, 832 F. Supp. 3d 303 (S.D.N.Y. 2026) (same), *appeal filed*, No. 26-862 (2d Cir. Apr. 6, 2026); *Plesha v. Ascension Health All.*, 2026 WL 279321 (E.D. Mo. Feb. 3, 2026) (same); *Williams v. Bally's Mgmt. Grp., LLC*, 813 F. Supp. 3d 263 (D.R.I. 2025) (same), *appeal filed*, No. 25-2159 (1st Cir. Dec. 10, 2025).[4]

For all of the reasons explained in those cases and below, the governing statute does not require the Plan to provide the program terms and disclosures he claims are required, particularly to this Plaintiff. The Plan here complied with the statute at every turn. Plaintiff's Complaint should be dismissed.

## I. Plaintiff's challenge to the Plan's alternative standard (Count I) fails as a matter of law.

Count I claims that the Plan's tobacco surcharge program is unlawful because enrollment in a tobacco cessation program after the alleged April 1 "enrollment deadline" removes the

[4] Plaintiff's counsel filed all four of the appeals of dismissal orders noted in this memorandum.

surcharge only prospectively for the rest of the Plan year, without providing reimbursement for any surcharges previously paid. Compl. ¶¶ 68-80. Those allegations fail to state a claim for two independent reasons. *First*, Plaintiff admits that the Plan *did* offer all participants the opportunity to avoid the entire tobacco surcharge by reporting no tobacco use or enrolling in a cessation program by April 1. That satisfies the statutory requirement to offer participants the opportunity to qualify for the reward "at least once each year," 42 U.S.C. § 300gg-4(j)(3)(C), and nothing in the statute requires the Plan to offer participants additional opportunities—after April 1—to avoid the surcharge. *Second*, Plaintiff does not allege that he had a medical condition that made it "unreasonably difficult" or "medically inadvisable" to cease using tobacco products, so the statute does not require the Plan to offer Plaintiff any "reasonable alternative standard" at all. 42 U.S.C. § 300gg-4(j)(3)(D). Instead, Congress only required that Plaintiff be given the opportunity to avoid the surcharge by reporting that he did not use tobacco. 42 U.S.C. § 300gg-4(j)(3)(C). Nothing more was required.

### A. Count I fails to state a claim because Plaintiff alleges that the Plan offers participants an annual opportunity to avoid the surcharge by enrolling in a tobacco cessation program.

Plaintiff objects that the Plan allegedly requires participants to enroll in a tobacco cessation program during an annual "three-month period" or "front-end enrollment window" in order to avoid the entire tobacco surcharge, and after that "eliminates the surcharge only prospectively" for the rest of the year. Compl. ¶¶ 39, 42. Plaintiff contends that this is unlawful and that plans must provide reimbursement of all surcharges paid to any participant who enrolls in a tobacco cessation program at any time during the year. *Id.* ¶ 42. Plaintiff is wrong.

Two statutory provisions govern Plaintiff's claims here. First, a plan must give participants "the opportunity to qualify for the reward under the program *at least once each year*." 42 U.S.C. § 300gg-4(j)(3)(C) (emphasis added); *see also* 29 C.F.R. § 2590.702(f)(4)(i) ("at least once per

year”). Plaintiff does not allege any violation of this “annual-opportunity requirement”; to the contrary, he alleges that every year, Plan participants may avoid paying any tobacco surcharge by either declaring that they do not use tobacco or enrolling in a cessation program by April 1. Compl. ¶¶ 37, 42.

Second, the statute states that “the full reward under the wellness program shall be made available to all similarly situated individuals.” 42 U.S.C. § 300gg-4(j)(3)(D). Plaintiff also does not allege any violation of this requirement either. Rather, he admits that participants equally may “obtain the same annual reward” of avoiding the entire tobacco surcharge either by declaring that they do not use tobacco or by enrolling in a cessation program by April 1. Compl. ¶ 42.

Courts have dismissed indistinguishable claims for that reason. *See, e.g.*, *Chirinian v. Travelers Cos.*, 2025 WL 2147271, at *8 (D. Minn. July 29, 2025) (“[A] plan need only provide one opportunity per year to enroll in a tobacco cessation program, as long as the plan provides the ‘full reward’ of the wellness program to those who timely enroll in and complete the cessation program.”); *Bailey v. Sedgwick Claims Mgmt. Servs., Inc.*, 2025 WL 2779899, at *11 (W.D. Tenn. Sept. 26, 2025) (interpreting “the ‘full reward’ and ‘frequency of opportunity’ requirements” identically); *Trout v. Meijer, Inc.* (“*Trout I*”), 2026 WL 1098213, at *4 (W.D. Mich. Apr. 23, 2026) (same); *Noel*, 832 F. Supp. 3d at 323 (same). DOL has long agreed. *See* DOL, *2014 FAQs*, *supra* (“If a participant is provided a reasonable opportunity to enroll in the tobacco cessation program at the beginning of the plan year and qualify for the reward (i.e., avoiding the tobacco premium surcharge) under the program, the plan is not required (but is permitted) to provide another opportunity to avoid the tobacco premium surcharge until renewal or reenrollment for coverage for the next plan year.”).

Significantly, this DOL 2014 FAQ did not break new ground in this interpretation. Instead, it just articulated how the statutory provisions work together. If a plan is not required to offer more

than one opportunity to avoid a tobacco surcharge, then nothing prohibits a plan from being more generous and offering participants a tobacco cessation program at other times during the year without any reward at all. And if that is true, certainly nothing prohibits a plan from offering participants a tobacco cessation program at other times during the year and rewarding those individuals by eliminating the tobacco surcharge once they complete that program—which is what Plaintiff alleges the Plan does here.

Plaintiff's real concern is that some participants—those who enroll in a tobacco cessation program after April 1—allegedly do not get a refund of the tobacco surcharges they paid before enrolling. Of course, Plaintiff does not claim that he was damaged by this alleged failure because he enrolled in a tobacco cessation program after April 1 (or at all). Regardless, plans are not required to provide reimbursement of surcharges paid for time periods before a participant satisfies the alternative standard. Instead, a plan complies with wellness program requirements so long as a participant's completion of a tobacco cessation program fully removes any surcharge from that point on. *E.g.*, *Spencer*, 2026 WL 2111153, at *16-17 ("Interpreting 'full reward' to give plan sponsors discretion whether to provide a retroactive rebate or a prospective discount, as this Court has, preserves both the statutory prohibition against health-status discrimination and the incentive-based structure Congress authorized through the wellness program scheme."); *Noel*, 832 F. Supp. 3d at 321 ("If an employer creates a program where the reward is an absence of a surcharge, and the surcharge is indeed fully removed once participants complete the reasonable alternative standard, it would be logical to conclude that the employer has thus provided the full reward—*i.e.*, the complete removal of the surcharge."). That is because "[n]owhere in the statutory text do the words "retroactive" or "reimbursement" appear." *Spencer*, 2026 WL 2111153, at *17; *see also* *Parker*, 826 F. Supp. 3d at 1300 ("[W]here the reward is a discount on premiums," a plan "cannot offer [a] $57.69 discount to those who test negative [for nicotine] and a mere $28.85 discount to

those who enroll in a cessation program.").[5]

Here, Plaintiff alleges that participants who enroll in the tobacco cessation program before April 1 avoid the surcharge for the whole year. *See* Compl. ¶¶ 41-42. That alone suffices to satisfy the statutory requirement. And the Plan here also "eliminates the surcharge … prospectively" for any participant who enrolls in a tobacco cessation program after April 1. *Id.* ¶ 39. These two features together afford participants more than the statute requires. *See* DOL, *2014 FAQs*, *supra*, at Q8; *Spencer*, 2026 WL 2111153, at *16-17; *Noel*, 832 F. Supp. 3d at 323; *Greene*, 2026 WL 785004, at *10; *Bally's*, 813 F. Supp. 3d at 279. And as the *Noel* court explained, Plaintiff cannot manufacture a violation by alleging that the Plan offers "participants *additional* opportunities to satisfy the standard and obtain the reward prospectively." *Noel*, 832 F. Supp. 3d at 324; DOL, *2014 FAQs*, *supra* at Q8; *Trout I*, 2026 WL 1098213, at *5 ("Meijer does not violate the requirement by additionally providing a partial benefit to those who complete the program later in the year."); *Chirinian*, 2025 WL 2147271, at *2 (granting motion to dismiss where plaintiff alleged that plan required participants to "enroll in a tobacco cessation program by March 31" to avoid the entire tobacco surcharge, and after that removed the surcharge "only on a prospective basis").[6]

Plaintiff thus fails to state a claim in Count I.

---

[5] DOL agrees with these courts' reading of the statute and regulation. DOL "will not take enforcement action against a plan or issuer for failure to provide a reward for satisfying a reasonable alternative standard under a health-contingent wellness program retroactively to the beginning of the plan year where," as alleged here, "the plan or issuer provides the reward corresponding to the period after the reasonable alternative standard is satisfied." DOL, *2026 FAQs*, *supra*.

[6] Comcast acknowledges that one court in this District has allowed a tobacco surcharge complaint to survive a Rule 12 challenge, but the plaintiff there alleged that "*no* reasonable alternative standard [was] available at any point." *Leslie v. Rentokil N. Am., Inc.*, 2026 WL 950490, at *4 (E.D. Pa. Apr. 8, 2026) (emphasis added). Of course, that is not the case here, where the Complaint and the SPD quoted in it make clear that participants could enroll in a tobacco cessation program offered by Comcast or a custom program with their personal physician. Compl. ¶ 37.

### B. Count I fails to state a claim because the statute requires plans to provide a reasonable alternative standard only to participants with specific medical needs that Plaintiff does not allege here.

Count I also fails because Plaintiff does not allege that he had a qualifying medical condition that would entitle him to a reasonable alternative standard in the first place.[7]

The relevant statutory provisions do not require plans to offer a reasonable alternative standard (like a tobacco cessation program) to *all* participants. Instead, the statute requires a plan to offer a reasonable alternative standard only to "any individual for whom" it is either (I) "unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard" or (II) "medically inadvisable to attempt to satisfy the otherwise applicable standard." 42 U.S.C. § 300gg-4(j)(3)(D)(i); 29 U.S.C. § 1185d. The statute reinforces these limits by allowing a plan to "seek verification, such as a statement from an individual's physician," of a participant's medical need. 42 U.S.C. § 300gg-4(j)(3)(D)(ii).

Plaintiff here does not allege that he had any qualifying medical condition. He does not allege that it would have been "unreasonably difficult" for him to cease using tobacco, or "medically inadvisable" for him to try. On Plaintiff's allegations, then, the statute allowed the Plan to impose a surcharge based on Plaintiff's use of tobacco products, full stop. *See* 42 U.S.C. § 300gg-4(b)(2)(B), (j)(3). In other words, Plaintiff had the opportunity to avoid the tobacco surcharge by not using tobacco. *See* 42 U.S.C. § 300gg-4(b)(2)(B), (j)(3). That is all the statute requires the Plan to offer him.

Plaintiff's claim therefore depends entirely on the 2013 Regulation, which purports to require a reasonable alternative standard for everyone, not just those for whom it would be "unreasonably difficult" or "medically inadvisable" to cease using tobacco. *See* 29 C.F.R.

---

[7] Although Plaintiff styles this case as a putative class action, he also does not allege that any other Plan participant had any such qualifying medical condition.

§ 2590.702(f)(4)(iv)(A) (requiring a reasonable alternative standard "for any individual who does not meet the initial standard" of not using tobacco, regardless of medical need). Comcast acknowledges that this is what the regulation says. But Plaintiff cannot state a claim based on a violation of this regulation for two independent reasons.

*First*, Plaintiff asserts Count I under "29 U.S.C. § 1132(a)(3)," Compl. ¶ 87, which allows suit "to enforce any provisions of *this subchapter*." 29 U.S.C. § 1132(a)(3) (emphasis added). The phrase "this subchapter" refers to statutory provisions, not regulations. *See Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("We hold that the key words 'specified under this subchapter' refer to statutory, but not to regulatory, specifications."). That is how the Third Circuit has interpreted the same phrase in ERISA. *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 146-47 (3d Cir. 2007) ("[T]he words 'this subchapter' in [29 U.S.C. § 1132](c) refer only to violations of statutorily imposed obligations, and … *the term does not embrace violations of regulations promulgated pursuant to the statute*." (emphasis added, citation omitted)). Thus, Plaintiff cannot state a cause of action under § 1132(a)(3) based on requirements imposed by the 2013 Regulation even if that regulation was "promulgated pursuant to the statute." *Id.*

*Second*, Plaintiff could not state a claim based on that asserted regulatory violation because the 2013 Regulation's expanded requirement does not reflect the best—or any—reading of the statutory text. Under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), courts must "independently interpret the statute," without deferring to the agency, to decide whether a regulation reflects the statute's "single, best meaning." *Id.* at 400. The 2013 Regulation does not. By requiring plans to make a reasonable alternative standard universally available, the 2013 Regulation reads out the explicit "unreasonably difficult" and "medically inadvisable" provisions of the statute. *Duncan v. Walker*, 533 U.S. 167, 176 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (citation and quotation marks omitted)); *Williams*

*v. Taylor*, 529 U.S. 362, 404 (2000) (applying the same "cardinal principle of statutory construction"). And the 2013 Regulation also reads out of the statute the discretion Congress gave to plans to verify with a participant's physician that a health factor "makes it unreasonably difficult or medically inadvisable for the individual to satisfy or attempt to satisfy the otherwise applicable standard." 42 U.S.C. § 300gg-4(j)(3)(E). After all, what is the point of a plan seeking verification that a participant has a medical condition that makes it "unreasonably difficult" or "medically inadvisable" to cease using tobacco if the plan has to offer the participant an alternative standard whether or not they have such a condition.

Congress drew these statutory provisions directly from the 2006 Regulation, which specifically explained that a plan did not need to provide *any* reasonable alternative standard unless and until a participant informed the plan of a qualifying medical need. *See* 2006 Regulation, 71 Fed. Reg. at 75019 ("It is sufficient to determine a reasonable alternative standard once a participant informs the plan that it is unreasonably difficult for the participant due to a medical condition to satisfy the general standard (or that it is medically inadvisable for the participant to attempt to achieve the general standard) under the program."). That statutory context makes it even more obvious that the 2013 Regulation's expanded requirement does not reflect the best reading of the statute. *See Loper Bright*, 603 U.S. at 400 ("In the business of statutory interpretation, if it not the best, it is not permissible.").

Plaintiff does not allege facts that he (or even anyone else) had a medical condition that triggered eligibility for the alternative standard under the statute. Count I fails to state a claim under ERISA's enforcement provision and should be dismissed. *See Spencer*, 2026 WL 2111153, at *9 n.7 and 16-21 (dismissing claims by participant who did not allege he had a qualifying medical condition); *see also Target*, 2026 WL 2111339, at *5-8 (dismissing another claim based on similar discrepancy between statute and 2013 Regulation).

## II. Plaintiff's challenge to the Plan's disclosures (Count II) fails because Plaintiff does not allege that any Plan document lacked any required content.

Count II challenges certain of the Plan's disclosures. But the Complaint does not allege *facts* showing any violation of any statutory requirement.

The statutory disclosure requirement is precise. Plans must "disclose in all plan materials describing the terms of the wellness program *the availability of a reasonable alternative standard* (or the possibility of waiver of the otherwise applicable standard)." 42 U.S.C. § 300gg-4(j)(3)(E) (emphasis added). Here, the Complaint pleads factual allegations about only two Plan documents, and Plaintiff does not allege facts that either violated any applicable requirement.

First, Plaintiff alleges that "Comcast's SPD describes the tobacco surcharge," and quotes the SPD. Compl. ¶ 37. The SPD, however, discloses the availability of a reasonable alternative standard: "Employees who declare as a tobacco user can avoid the tobacco-user rate by enrolling in and completing Comcast's Tobacco Cessation Program." *Id.* The SPD also includes contact information for enrolling in the program and explains that "[e]mployees also have the option to enroll in a tobacco cessation program through their Primary Care Physician." *Id.* ("To enroll in this program, employees can contact ComPsych at 1-888-515-4327."). This is above and beyond what the statute requires.[8]

*Second*, Plaintiff challenges a 2013 "fact sheet," but his allegations again show that this document satisfied all applicable requirements. Compl. ¶ 41. Plaintiff excerpts a single sentence

---

[8] Of course, Congress knew how to include detailed disclosure requirements in ERISA when that is what Congress intended. Just as one (of many) examples, Congress requires defined contribution plans to disclose to participants a quarterly pension benefit statement that includes details about "the value of each investment to which assets in the individual account have been allocated, determined as of the most recent valuation date under the plan, including the value of any assets held in the form of employer securities" and an "explanation, written in a manner calculated to be understood by the average plan participant, of the importance, for the long-term retirement security of participants and beneficiaries, of a well-balanced and diversified investment portfolio." 29 U.S.C. § 1025(a)(2)(B).

of this fact sheet, which allegedly states that "[t]obacco users who set their status as a tobacco user ready to quit and enroll in our Tobacco Cessation Program by April 1, 2013 will keep the tobacco-free rate." *Id.* Once again, this discloses the availability of the alternative standard—"our Tobacco Cessation Program"—and nothing more was required.

Nevertheless, Plaintiff again points to *regulatory* disclosure requirements that go beyond the statute. Specifically, the 2013 Regulation purports to require plans to disclose "contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated." *Id.* That does not save Plaintiff's disclosure claims from dismissal for several reasons:

1. The SPD includes all the information required by the 2013 Regulation. Compl. ¶ 37; *see supra* at 18 . It provides contact information (a phone number) for enrolling and it explains that "[e]mployees also have the option to enroll in a tobacco cessation program *through their Primary Care Physician*." Compl. ¶ 37 (emphasis added). This is what the regulations purport to require, as reflected in the example language provided by the DOL in the 2013 Regulation: "Stop smoking today! We can help! If you are a smoker, we offer a smoking cessation program. If you complete the program, you can avoid this surcharge." 29 C.F.R. § 2590.702(f)(4)(vi) (Example 6). The 2013 Regulation makes clear that provided this disclosure also includes "contact information and the individual's option to involve his or her personal physician," the requirements are satisfied. *Id.* That is exactly the case here. And to the extent that Plaintiff is arguing that plans also need to specifically mention that they will provide "retroactive reimbursement" of surcharges already paid, the 2013 Regulation does not say that, and the DOL's own Example 6 makes clear that it is not required. *Id.*

2. Plaintiff does not even allege that the 2013 fact sheet was issued after the 2013 Regulation became effective and therefore was subject to it. Instead, the Complaint itself admits

that the 2013 Regulation was "signed in 2013 *to be effective January 1, 2014*." Compl. ¶ 26 (emphasis added) (citing 78 Fed. Reg. at 33158-60). And the 2013 fact sheet makes clear that it was published *before* April 1, 2013, because that was the deadline for enrolling. Compl. ¶ 41 ("One fact states that '[t]obacco users who set their status as a tobacco user ready to quit and enroll in our Tobacco Cessation Program *by April 1, 2013* will keep the tobacco-free rate." (emphasis added)). In other words, the 2013 Regulation on which Plaintiff's claim is based does not even apply to this 2013 fact sheet.

3. Plaintiff's disclosure claim in Count II, like Count I, is brought pursuant to 29 U.S.C. § 1132(a)(3), which does not allow enforcement of regulations because they are not part of "this subchapter," even when those regulations are promulgated pursuant to statutory provisions. *See supra* at 16.

4. The 2013 Regulation's disclosure requirements do not reflect the best reading, or any reading, of the statutory language. *See supra* at 16-17. For example, the statute gives plans the right (but not the obligation) to talk with a participant's physician about the participant's medical condition. 42 U.S.C. § 300gg-4(j)(3)(D)(ii). That is the only place in the statute where a participant's physician is mentioned. But the 2013 Regulation turns that provision on its head by *requiring* a plan to tell participants it will accommodate their physicians' requests. In other words, the 2013 Regulation takes away plans' discretion to talk with participant physicians or to not do so, and instead gives participants the discretion over those decisions. Likewise, Congress elsewhere in ERISA explicitly requires certain disclosures to include contact information, including "the address and phone number of the plan administrator and the plan's principal administrative officer, each plan sponsor's employer identification number, and the plan number of the plan." 29 U.S.C. § 1021(e)(2)(B); *see also* 29 U.S.C. § 1023(e)(2) (requiring disclosure of "names and addresses of the brokers, agents, or other persons to whom commissions or fees were

paid, the amount paid to each, and for what purpose"). Congress included none of that in the provision at issue in this case. Under these circumstances, nothing in the statutory notice provision can even arguably be "read as allowing agencies to promulgate additional disclosure requirements." *Target*, 2026 WL 2111339, at *6; *Spencer*, 2026 WL 2111153, at *21 (dismissing claim alleging regulatory notice violations because "the 2013 Regulations carved language relating to notice that personal physician recommendations will be accommodated out of whole cloth without a statutory foothold"); *Trout v. Meijer, Inc.* ("*Trout II*"), 2026 WL 2581855, at *3-4 (W.D. Mich. Sept. 1, 2026) (similar).

Lastly, Plaintiff alleges that other, unidentified documents may or may not have been provided to him and may or may not have included required information. Such naked conclusory statements cannot form the basis of a claim because Plaintiff cannot state a claim when he "has not identified any communication that did not provide such notice." *Noel*, 832 F. Supp. 3d at 325-26. Rather, his "inability to identify a single such document reveals [his] pleading to be little more than speculation." *Greene*, 2026 WL 785004, at *7; *Noel*, 832 F. Supp. 3d at 326 (finding "no reason that Plaintiff could not have examined employee-facing documents … to determine what notices they contain").

More fundamentally, Plaintiff's attempt to state a claim that the Plan's notices were deficient reveals how and why he lacks Article III standing to press his disclosure claims in the first place. Article III does not confer standing on any plaintiff who claims that a defendant failed to comply with some legal notice requirement. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 441-42 (2021). In order to establish an Article III injury in such a case, the plaintiff must "identif[y] … 'downstream consequences' from failing to receive the required information." *Id.* at 442 (citation omitted). But Plaintiff here "has only alleged that he failed to receive legally required information," without pleading any factual allegations to suggest that the supposed

deficiencies in "Plan materials … affected him" in any way, "such as by preventing him from enrolling in" a cessation program in which he otherwise would have enrolled. *Spencer*, 2026 WL 2111153, at *9. And although a "monetary loss[] does count as a concrete injury for Article III purposes," Plaintiff "never establishes" that his payment of any surcharge "is traceable to Defendant's allegedly defective notice." *Plesha*, 2026 WL 279321, at *7. Plaintiff's allegations do "not demonstrate[] how [his] behavior would have changed with a compliant notice," and he cannot establish Article III standing to assert his notice claim when his Complaint shows that he "would be in the exact same place with or without the purported defects." *Id.*; *accord Spencer*, 2026 WL 2111153, at *9-10.

Count II should be dismissed.

## III. Plaintiff's derivative fiduciary-related claims (Counts III-IV) fail as a matter of law.

Finally, Plaintiff asserts claims for breach of fiduciary duty based on the same allegations about the tobacco surcharge program. Compl. ¶¶ 88-102 (Count III); *id.* ¶¶ 103-106 (Count IV). Counts III and IV are thus derivative of Counts I and II and fail for the same reasons. *See, e.g.*, *Spencer*, 2026 WL 2111153, at *21 (dismissing fiduciary-related claims "because the Plan meets all of the aforementioned statutory and regulatory requirements"); *Williams*, 2026 WL 2111339, at *8 (similar). These claims also fail for additional independent reasons.

### A. Count III fails as a matter of law because Plaintiff does not allege any loss to the Plan, as required.

Count III seeks "Plan-wide relief" under 29 U.S.C. § 1132(a)(2). Compl. ¶ 102. This cause of action "does not provide a remedy for individual injuries distinct from plan injuries." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). Plaintiff therefore "must assert a loss to the ERISA plan itself (not merely an individual claim for extracontractual damages)." *Leckey v. Stefano*, 501 F.3d 212, 217 (3d Cir. 2007). In order to "determine whether there has been a loss

to the plan, … 'a comparison must be made between the value of the plan assets before and after the breach.'" *Id.* at 226 (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 603 (8th Cir. 1995)).

Plaintiff does not allege the necessary loss to the Plan here. He asserts that Comcast used surcharges to "offset" Comcast's funding obligations, thereby "shifting costs to participants." Compl. ¶¶ 92, 98. That is not a loss *to the Plan*. Indeed, Plaintiff specifically alleges that tobacco surcharges replaced employer contributions "dollar-for-dollar." *Id.* ¶¶ 53-54, 92. Plaintiff thus alleges that the Plan received the same amount of funding, just from a different source. Courts have dismissed indistinguishable tobacco surcharge claims for that very reason. *See, e.g., Parker*, 826 F. Supp. 3d at 1302 ("This may describe a loss to [a plaintiff] personally, but the plan received the same amount of money either way."); *Noel*, 832 F. Supp. 3d at 328 ("The amount contributed to the Plan would seemingly be the same, regardless of whether the contributions were coming from Defendants or tobacco-using participants."); *Schultz v. Glens Falls Hosp.*, 2026 WL 850332, at *12 (N.D.N.Y. Mar. 26, 2026) ("The Plan was not harmed by Defendant offsetting its own contributions with the surcharge proceeds."). This Court should too.

### B. Plaintiff's fiduciary breach allegations in Counts III and IV fail as a matter of law because Plaintiff does not challenge any fiduciary conduct.

Plaintiff's fiduciary breach claims in Counts III and IV fail because Plaintiff does not challenge any fiduciary conduct.

The "threshold question" for any claim asserting a breach of fiduciary duty is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Fiduciary acts are generally limited to "discretionary acts of plan administration" and distinguished from "settlor acts," such as "the adoption, modification, or termination of an employee benefit plan." *Wachtel*

*v. Health Net, Inc.*, 482 F.3d 225, 233 (3d Cir. 2007). An employer acting as a settlor cannot breach fiduciary duties because "ERISA's fiduciary requirement simply is not implicated" when the employer, "acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999).

Plaintiff here challenges settlor functions, not fiduciary conduct. He objects to "design choices" related to the Plan's tobacco surcharge: when it applies, and when and to what extent it is removed or reimbursed. Compl. ¶ 86. Plaintiff therefore challenges the "design of the plan itself," not discretionary choices that Plan terms leave to the judgment of a fiduciary. *Hughes Aircraft Co.*, 525 U.S. at 444. In fact, ERISA only imposes liability against a fiduciary for breaches of "duties *imposed upon fiduciaries* by this subchapter." 29 U.S.C. § 1109(a) (emphasis added). But the statutory provisions Plaintiff claims were violated, 42 U.S.C. § 300gg-4(j)(3), do not even mention fiduciaries, but instead impose obligations on certain plans or health insurance issuers. There is no basis for imposing fiduciary liability under these circumstances.[9] *See Groves v. Modified Ret. Plan*, 803 F.2d 109, 116 (3d Cir. 1986) (statutory section that "provides for personal sanctions against plan administrators" did not apply to violation of provisions that "impose duties on the plan" itself).

For these reasons, courts have dismissed supposed "fiduciary" claims where, as here, the plaintiff's underlying "grievance … seems to be with the collection of the surcharge from the participants, which is a feature of the structure of the Plan and therefore implicates a settlor rather than fiduciary function." *Noel*, 832 F. Supp. 3d at 328; *accord, e.g.*, *Sec'y of Lab. v. Macy's, Inc.*, 2021 WL 5359769, at *18 (S.D. Ohio Nov. 17, 2021) (indistinguishable allegations that defendant

[9] The Complaint makes clear that there is no health insurance involved here, because the Plan is self-funded. Compl. ¶ 52.

"implemented a discriminatory wellness program *in accordance with* the impermissibly discriminatory terms" were "not enough to make [it] a fiduciary rather than a settlor with respect to the conduct" at issue); *Parker*, 826 F. Supp. 3d at 1302; *Greene*, 2026 WL 785004, at *11; *Plesha*, 2026 WL 279321, at *9.

To the extent that the Complaint attempts to plead anything beyond a challenge to Plan terms themselves, it does not state a plausible claim for breach of fiduciary duty. For example, collecting surcharges pursuant to plan terms is not fiduciary conduct. *See* 29 C.F.R. § 2509.75-8 (D-2) ("[c]ollection of contributions … as provided in the plan" is not a fiduciary function because it involves no "discretionary authority or discretionary control"). Neither is an employer allegedly reducing its own contributions to a plan. *See, e.g.*, *McCaffree Fin. Corp. v. ADP, Inc.*, 2022 WL 970282, at *7 (D.N.J. Mar. 31, 2022) (collecting cases holding that employer decisions "concerning [plan] funding" are "settlor functions" that "do not implicate fiduciary duties" (citation omitted)). At bottom, the Complaint just recycles Counts I and II and thus fails to state an independent claim for breach of fiduciary duty. *See, e.g.*, *Noel*, 832 F. Supp. 3d at 327 ("[P]lan administrators do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions." (citation and quotation marks omitted)); *Parisi v. Am. Airlines, Inc.*, 2025 WL 4663147, at *7 (N.D. Tex. Nov. 25, 2025) (similar).

### C. Plaintiff's prohibited transaction allegations in Counts III and IV fail as a matter of law.

Counts III and IV also briefly assert conclusions of prohibited transactions, in violation of 29 U.S.C. § 1106, on a theory that collecting tobacco surcharges allowed Comcast to "offset" or "reduce" its own employer contributions to the Plan. Compl. ¶¶ 99, 104. Plaintiff fails to state any such claim for at least two independent reasons.

*First*, ERISA's prohibited-transaction provisions apply to only fiduciary conduct. *See* 29 U.S.C. § 1106(a), (b) ("*A fiduciary with respect to a plan shall not*…"). Plaintiff here challenges Plan terms themselves and their ministerial execution, not any fiduciary conduct. *See supra* at 23-25. *Second*, a prohibited transaction claim requires an unlawful "transaction." *See, e.g.*, *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 82 (3d Cir. 2012) (relevant statutory provisions prohibit specified "transactions"); *Barragan v. Honeywell Int'l Inc.*, 2025 WL 2383652, at *5 (D.N.J. Aug. 18, 2025) (granting motion to dismiss where Plaintiff failed to plausibly allege an unlawful "transaction"). Collecting employee health plan premiums *under* the Plan—collecting them from participants and paying them *to the Plan*—is not a "transaction" *with Comcast*, or otherwise unlawful. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000). Similarly, to the extent that Plaintiff's real complaint is that Comcast allegedly saved money by *not* contributing to the Plan, that is not a "transaction" at all. *See Brown v. Peco Foods, Inc.*, 812 F. Supp. 3d 664, 676-77 (S.D. Miss. 2025) (collecting cases holding that reduction of employer contributions does not constitute a "transaction" under the statute).

Courts have recognized these deficiencies in dismissing prohibited transaction claims indistinguishable from Plaintiff's. *See, e.g.*, *Greene*, 2026 WL 785004, at *12 (rejecting claim for challenging non-fiduciary conduct of defendant "designing and implementing the plan"); *Trout II*, 2026 WL 2581855, at *7 (rejecting employer contribution "offset" theory as basis for prohibited transaction claim); *Schultz*, 2026 WL 850332, at *12 (similar). More fundamentally, ERISA itself forecloses Plaintiff's claim. The statute expressly allows both the collection of employee contributions and the assessment of surcharges under wellness programs. *See* 29 U.S.C. § 1182(b)(2). Plaintiff's theory would find an unlawful "prohibited transaction" in any such wellness program—and more generally any time an employer collected any premiums from employees for health or other benefits. *See Greene*, 2026 WL 785004, at *12 ("To characterize

the mere act of collecting premiums and/or surcharges as an unlawful transaction would essentially nullify even ERISA compliant wellness programs.”). For these reasons, Counts III and IV fail to state a prohibited transaction claim.

**CONCLUSION**

Comcast respectfully requests that the Court dismiss the Complaint in full.

Dated: October 19, 2026

Respectfully submitted,

*/s/ Jeremy P. Blumenfeld*

Jeremy P. Blumenfeld (PA ID #85955)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
jeremy.blumenfeld@morganlewis.com

Gina F. McGuire (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Fax: (212) 309-6001
gina.mcguire@morganlewis.com

Andrew R. Hellman (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 739-3000
Fax: (202) 739-3001
andrew.hellman@morganlewis.com

*Counsel for Defendants*